UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

OLAFUR GUDMUNDSSON,
SALLY A. RUDRUD,

                              Plaintiffs,

                                                    <u>DECISION AND ORDER</u>

                                                    08-CV-6131L

            v.

UNITED STATES OF AMERICA,

                              Defendant.
_____

       Plaintiffs, Olafur Gudmundsson and Sally Rudrud, commenced this action on March 21,

2008, against the United States of America ("Government"), seeking a refund of roughly $300,000

in income taxes that they paid for the calendar year 1999. The Court has jurisdiction over this action

under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422. *See Gulden v. United States*, 287 Fed.Appx.

813, 817 (11ᵗʰ Cir. 2008); *Field v. United States*, 328 F.3d 58, 59 (2d Cir. 2003).

       Both sides have moved for summary judgment. For the reasons that follow, plaintiffs'

motion is denied, the Government's motion is granted, and the complaint is dismissed.


                          **FACTUAL BACKGROUND**


       The relevant facts are not in dispute, and are set forth in a joint stipulation of material facts

("Stip.") entered into by the parties. Dkt. #12-2. Although the sixteen-page stipulation recites a

detailed series of facts involving various financial transactions and corporate decisions, the essential facts are fairly straightforward.

At all times relevant to this action, Gudmundsson was an officer of Aurora Foods, Inc. ("Aurora"). Aurora was part of a larger group of companies owned by a consortium of private investors.

As part of a plan of reorganization involving those various corporations, an initial public offering ("IPO") of Aurora stock was made on July 1, 1998. Pursuant to Aurora's employee incentive compensation plan, and in conjunction with that IPO, at the time of the IPO Gudmundsson received the right to the distribution of 73,105 shares of Aurora stock. Stip. ¶¶ 15, 20; Stip. Ex. 6 (Dkt. #12-12) at 10, § (c). The actual distribution of the stock would not occur until a year later, however, on July 1, 1999. Stip. ¶¶ 17, 25; Stip. Ex. 6 § 11.

Plaintiffs (who were married at the time but are now divorced) timely filed their 1999 federal income tax return on or before April 15, 2000. They reported wages of a little over $2 million, which included nearly $1.3 million in compensation from Aurora, based on the distribution to Gudmundsson of the Aurora stock. That amount was calculated by multiplying the number of shares that Gudmundsson received in the distribution, 73,105, by $17.685, which represented the average per-share price of Aurora stock on the New York Stock Exchange on July 1, 1999. *Id.* ¶ 27. Plaintiffs now claim that they were not required to report the full $1.3 million and, accordingly, seek a refund.

In late November 1999, Aurora announced that its earnings for the fourth quarter of that year would fall short of estimates. Following that announcement, Aurora's stock price fell over 26% from November 22 to November 24, 1999. *Id.* ¶ 21.

In February 2000, Aurora's auditors informed Aurora's audit committee that the auditors had discovered documents that raised some questions about Aurora's recent accounting practices. On February 11, Aurora's board of directors ("board") appointed a committee to investigate those practices. The first public disclosure of any potential accounting fraud at Aurora came on February 17, 2000, when the company announced that investigation. *Id.* ¶ 22.

On that same date, several members of Aurora's senior management, including its chairman and chief executive officer, and its vice chairman and chief financial officer, resigned. From February 17 to February 22, 2000, Aurora's stock price fell roughly 50%. *Id.*

In April 2000, Aurora announced that it was reducing its previously reported pre-tax earnings for the last half of 1998 and the first three quarters of 1999 by a total of over $81 million. In January 2001, the United States Attorney for the Southern District of New York announced indictments against the former Aurora officers who were allegedly responsible for the accounting improprieties, charging them with securities fraud and related charges. Those officers eventually entered guilty pleas in satisfaction of the charges against them. There is no allegation or evidence that Gudmundsson had any prior knowledge of the accounting fraud, and he was not charged with any wrongdoing.

On or before April 15, 2003, plaintiffs filed an amended tax return for 1999, claiming a refund of $301,834 plus interest. The refund claim was based on plaintiffs' assertion that the amount

of wages to be included in their income for that year as a result of the Aurora stock distribution to Gudmundsson on July 1, 1999, should have been based on the $7.5625 per-share value of Aurora stock as of December 31, 1999, rather than the per-share value as of July 1, 1999, which they had used in their original 1999 tax return.

On April 3, 2006, the Internal Revenue Service disallowed plaintiffs' refund claim. Plaintiffs filed this action on March 21, 2008. The complaint asserts six causes of action, all of which are centered on plaintiffs' allegation that the income that they reported in their 1999 tax return, attributable to the July 1, 1999 stock distribution, was vastly overstated due to the fraudulent manipulation of Aurora's financial statements by its top officers.

## DISCUSSION

### I. Standard of Review

Under 28 U.S.C. § 1346(a)(1), United States district courts have original jurisdiction over

[a]ny civil action against the United States for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal revenue laws.

"In actions brought pursuant to this provision, a district court generally reviews the determination and assessment of the entire tax liability de novo, 'plac[ing] itself in the shoes of the Commissioner' [of Internal Revenue]." *Carione v. United States*, 368 F.Supp.2d 186, 191-92 (E.D.N.Y. 2005) (quoting *R.E. Dietz Corp. v. United States*, 939 F.2d 1, 4 (2d Cir. 1991)). The

taxpayer bears the burden of proving that the tax assessment is erroneous. *United States v. Janis*, 428 U.S. 433, 440 (1976).

> To prevail, the taxpayer must first
>
> present substantial evidence as to the wrongfulness of the Commissioner's determination to meet the burden of going forward. Even if this burden is met, the taxpayer still bears the burden of persuasion. Thus, a plaintiff must both come forward with enough evidence to support a finding contrary to the Commissioner's determination and then still carry the ultimate burden of proof.

*Gourley v. United States*, No. 08-558, 2009 WL 2700206, at *4 (Fed. Cl. Aug. 26, 2009) (citations and quotation marks omitted).

## II. Relevant Statutory and Regulatory Provisions

The parties agree that, in general, the taxability of the compensation at issue here, *i.e.*, the stock distribution to Gudmundsson in July 1999, is governed by § 83 of the Internal Revenue Code. Insofar as it is relevant to the case at bar, § 83(a) provides that "[i]f, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed," then the excess of

> (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
>
> (2) the amount (if any) paid for such property,
>
> shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

26 U.S.C. § 83(a).

The terms "transferable" and "subject to a substantial risk of forfeiture" lie at the heart of the present dispute. Plaintiffs contend that the stock that was received by Gudmundsson on July 1, 1999 was either not transferable, or was subject to a substantial risk of forfeiture, for at least six months after that date, based on a number of theories, as will be explained later in this Decision and Order.

Section 83, and the relevant Securities Exchange Commission ("SEC") regulations, shed some light on the meaning of those terms. The regulations state that "whether a risk of forfeiture is substantial or not depends upon the facts and circumstances," and that a "substantial risk of forfeiture exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied." 26 C.F.R. § 1.83-3(c).

Section 83 also provides that "[t]he rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." 26 U.S.C. § 83(c)(2). In other words, as explained in the regulations, "the rights of a person in property are transferable if such person can transfer any interest in the property to any person other than the transferor of the property, but only if the rights in such property of such transferee are not subject to a substantial risk of forfeiture." 26 C.F.R. § 1.83-3(d).

In addition, § 83 states that a person's rights in property are considered to be subject to a substantial risk of forfeiture, and not transferable, if "the sale of [such] property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934 ... ." 26 U.S.C. § 83(c)(3). Under § 16(b), which is codified at 15 U.S.C. § 78p(b), a shareholder may bring suit

against a corporate "insider" to force him to disgorge to the corporation any profit realized by the insider as a result of a purchase and sale, or sale and purchase, of a covered equity security of the corporation within a six-month period. *See Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 496 (3d Cir. 2008) ("section 16(b) of the Securities and Exchange Act of 1934 ... generally provides for the disgorgement of any profits earned by statutory insiders from short-swing trading"); *Roth ex rel. Beacon Power Corp. v. Perseus L.L.C.*, 522 F.3d 242, 245-46 (2d Cir. 2008) (noting exemption for certain transactions from "Section 16(b)'s otherwise blanket ban on short-swing profits").

"An 'insider' is defined in the statute as a beneficial owner of more than ten percent of any class of the company's non-exempt, registered equity securities, or a director or officer of the company issuing the stock." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing 15 U.S.C. § 78p(a), (b)). The parties here agree that Gudmundsson was a statutory insider at all relevant times. *See* Stip. ¶¶ 10, 20.


### III. Plaintiffs' Arguments

Plaintiffs contend that July 1, 1999, the date on which the Aurora stock was delivered to Gudmundsson, is not the proper date for valuation of the stock. Plaintiffs argue instead for three possible alternative dates.

The first valuation date proposed by plaintiffs is December 31, 1999. That was the date on which the six-month waiting period under § 16(b) expired.

Second, plaintiffs suggest a valuation date of July 1, 2000. They base that on a provision in a Securityholders Agreement (Stip. Ex. 3) entered into on April 8, 1998 by a number of entities and

individuals, including Gudmundsson, concerning the IPO and related issuance of Aurora stock, including the stock issued to Gudmundsson. That agreement placed certain restrictions on the ability of the recipients of the stock to transfer it to other persons, for a period of two years after the date of the IPO. Stip. Ex. 3 § 3.1.2. The agreement did, however, allow a recipient of the stock to transfer it within that two-year period to certain "permitted transferees," including members of the recipient's immediate family. *Id.* § 11.2.

Third, plaintiffs contend that the Court could determine a "date ... under § 10(b) of the 1934 Act when [Gudmundsson] was free to sell without liability for trading on the basis of nonpublic information." Plaintiffs' Brief (Dkt. #11) at 8. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b). Plaintiffs argue that § 10(b) is similar to § 16(b), and, therefore, that "[i]ts application should lead to the same result as under § 16(b)." *Id.*

Plaintiffs contend that by virtue of Gudmundsson's position within Aurora, and the terms of Aurora's Insider Trading Policy, *see* Stip. Ex. 19, he was restricted from transferring the stock for a period of time, without running afoul of that policy and § 10(b), as implemented by SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. In particular, plaintiffs assert that under the Insider Trading Policy, Gudmundsson was restricted from selling his stock for at least three days after the release to the public of any material, previously nonpublic information of which Gudmundsson had been aware. *See* Stip. Ex. 19 at 3. That restriction, plaintiffs state, would renew each time a new piece of insider information was released.

Plaintiffs contend that, should they prevail on their motion, issues of fact concerning whether, and on what date, material nonpublic information was released would have to be determined at trial. Plaintiffs further contend, however, that since that date could be difficult to determine, July 1, 2000 is a more appropriate valuation date, and that is the date that plaintiffs most strongly urge the Court to accept.[1]

In addition to their arguments concerning the proper valuation date, plaintiffs also contend that the publicly traded price of Aurora stock on *any* given date is not the proper measure of market value. Plaintiffs argue that the valuation of the stock should take account of the accounting fraud that had inflated the price of Aurora stock as of July 1, 1999. In particular, plaintiffs contend that if that date is used as the valuation date of the stock (although, as explained above, they do not believe that it should be), then the stock should be valued by taking into consideration that fraud, which was unknown to plaintiff at the time that he received the stock. Plaintiffs state that, if the Court were to adopt this approach, the precise value of the stock would be an issue for trial.

---

[1]Both sides in this case have requested a trial by jury. In a tax refund suit under 28 U.S.C. § 1346(a)(1), the district court "must try these claims by jury if a party requests." *Dunmore v. United States*, 358 F.3d 1107, 1116 (9th Cir.. 2004) (citing 28 U.S.C. § 2402). *See also Lehman v. Nakshian*, 453 U.S. 156, 161 n.8 (1981) (in enacting § 1346(a)(1), Congress "fashion[ed] a narrow exception" to the general policy against allowing jury trials in actions against the United States).

**DISCUSSION**

## I. When Did Gudmundsson's Rights First Become Transferable or not Subject to a Substantial Risk of Forfeiture?

There appears to be no dispute here that the Aurora stock was transferred to Gudmundsson on July 1, 1999. Under § 83, therefore, the fair market value of that stock is includable in plaintiffs' gross income in the first taxable year in which Gudmundsson's rights in that stock were transferable or were not subject to a substantial risk of forfeiture.[2]

As stated, "the rights of a person in property are transferable if such person can transfer any interest in the property to *any person* other than the transferor of the property," provided that "the rights in such property of such transferee are not subject to a substantial risk of forfeiture." 26 C.F.R. § 1.83-3(d) (emphasis added). Under the plain language of that statute, Gudmundsson's rights in the stock were clearly transferable upon his receipt of the stock on July 1, 1999, since he could have transferred the stock to a "permitted transferee," as defined in § 11.2 of the Securityholders Agreement. *See Tanner v. Commissioner*, No. 02-60463, 2003 WL 21310275, at *2 (5th Cir. Mar. 26, 2003) (although "lockup" agreement prohibited taxpayer, for two years, from selling stock that had been issued to him by corporation of which he was an officer, agreement "did not prohibit him from assigning his ... stock to another (he gave some of his stock to relatives) or pledging it as collateral for a loan. Under the regulations, [the taxpayer's] interest was plainly

---

[2]At page 26 of its brief (Dkt. #12-26), the Government contends that "it is certainly arguable that the transfer of the property took place on July 1, 1998," *i.e.*, the date on which Gudmundsson received the right to a future distribution of Aurora stock, but the Government does not rely on that argument, and states that it "accept[s] that that [transfer ] date is July 1, 1999 ... ."

transferable and thus substantially vested" at the time that he exercised his stock options) (parentheses in original) (unreported case).

The question, then, is not whether the stock should be *included* in Gudmundsson's gross income in 1999, but how it should be *valued*. That defeats plaintiffs' contention that the stock should be valued based on the publicly traded price of Aurora stock on July 1, 2000. As stated, plaintiff's use of that date is based on the two-year restriction on the stock's transfer, commencing on the date of the IPO, imposed by the Securityholders Agreement.

Again, though, that restriction was not a complete ban on transfer. Section 83 provides that a person's gross income should include "the fair market value of ... property ... at the first time the rights of the person ... are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier," less any amount paid for such property. That occurred here when Gudmundsson received the stock shares on July 1, 1999, because as of that date, he *could* have transferred his stock shares to certain permitted transferees.

Relying on the provision in the regulations that property can only be considered transferable if the transferee's rights are not subject to a substantial risk of forfeiture, 26 C.F.R. § 1.83-3(d), plaintiffs argue that "no transferee could escape the restrictions of the [Securityholders] Agreement," Plaintiff's Brief (Dkt. #11) at 16. Plaintiffs argue, in effect, that until all such restrictions expired, the property remained subject to a substantial risk of forfeiture. Hence, their argument goes, it would be improper to value the property using a date prior to the lifting of those restrictions, at least without taking those restrictions into account in determining the property's value.

That argument misses the point. Section 7.1 of the Securityholders Agreement does state that no transfer to a permitted transferee will be effective unless the transferee agrees in writing to "continue to be subject to all of the provisions of this Agreement and [to] be bound by and a party to this Agreement to the same extent as the transferor ... ." That does not make the transferee's rights any more forfeitable than the transferor's, however. Merely being subject to the restrictions of the Securityholders Agreement does not mean that a permitted transferee's rights would be subject to a substantial risk of *forfeiture*. In fact, the parties agree that "[t]he remedy for non-compliance with this transfer restriction did not include forfeiture of the shares of Aurora Foods Inc. so transferred." Stip. ¶ 8. Thus, there is no reason not to use July 1, 1999 as the proper valuation date of the property, as plaintiffs in fact did on their original 1999 tax return.

In addition, § 83 expressly provides that the fair market value of the property is to be "determined without regard to any restriction other than a restriction which by its terms will never lapse ... ." In other words, the only type of restrictions that may be considered in determining fair market value are so-called "nonlapse" restrictions. *See* 26 C.F.R. §§ 1.83-3(h), (I) (defining a "nonlapse restriction" as, in part, "a permanent limitation on the transferability of property," and a "lapse restriction" as "a restriction other than a nonlapse restriction as defined in paragraph (h) of this section").

Section 83 "makes no distinction between contractually imposed and legally imposed restrictions." *Pledger v. Commissioner*, 641 F.2d 287, 293 (5th Cir. 1981). As the Second Circuit has explained, this means that "[t]he actual value of the stock arguably may be less than the value of stock readily transferable on the open market because of restrictions imposed by the stock

purchase plan.  Nevertheless, these restrictions, other than permanent, nonlapsing restrictions, *may not be considered* in determining fair market value." *Sakol v. Commissioner*, 574 F.2d 694, 696 (2d Cir. 1978) (emphasis added), *cert. denied*, 439 U.S. 859 (1978)).   Thus, the fact that the Securityholders Agreement placed certain restrictions on Gudmundsson's ability to transfer the stock, for a limited period of time, is not to be taken into account in determining the stock's value for purposes of § 83.

It is true, as plaintiffs point out, that a person's rights in property are considered to be subject to a substantial risk of forfeiture, and not transferable, if "the sale of [such] property at a profit could subject a person to suit under section 16(b) of the Securities Exchange Act of 1934 ... ."  26 U.S.C. § 83(c)(3).  Gudmundsson, however, could have sold the stock on July 1, 1999, without running afoul of § 16(b).  To understand why that is so requires a multistep analysis.

First, the conveyance to Gudmundsson both of the distribution rights in 1998 and of the actual stock a year later were performed pursuant to a plan that had been approved by Aurora's board of directors.  The regulations provide that "[a]ny transaction, other than a Discretionary Transaction, involving an acquisition from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt [from § 16(b)] if ... [t]he transaction is approved by the board of directors of the issuer ... ."  17 C.F.R. § 240.16b-3(d)(1).[3]

---

[3]A "discretionary transaction" is

a transaction pursuant to an employee benefit plan that:

(I) Is at the volition of a plan participant;

(continued...)

In *Gryl v. Shire Pharmaceuticals Group PLC*, 298 F.3d 136 (2d Cir. 2002), *cert. denied*, 537 U.S. 1191 (2003), the Second Circuit held that the exemption under Rule 16b-3(d)(1) applies to any transactions "if the board approves the overall plan of which the subject transactions are but a constituent part, so long as the plan approved is one 'pursuant to which the terms and conditions of each transaction are fixed in advance, such as a formula plan.'" *Id.* at 141-42 (quoting 17 C.F.R. § 240.16b-3 note 3). A "formula plan," in general, is a plan in which the terms and conditions of each transaction are fixed in advance. *Gryl*, 298 F.3d at 142; *Tinney v. Geneseo Communications, Inc.*, 502 F.Supp.2d 409, 412 (D.Del. 2007). To meet that standard, "[a] formula plan must be sufficiently prescriptive in order 'to prevent insiders from having, directly or indirectly, any control over the terms of their own awards, and therefore removes the ability of the insiders to time their acquisitions under the plan to take advantage of inside information.'" *Gryl*, 298 F.3d at 142 (quoting Ownership Reports & Trading by Officers, Dirs. & Principal Sec. Holders, Exchange Act Release No. 28,869 [1990-1991 Transfer Binder], Fed. Sec. L. Rep. (CCH) ¶ 84,709, at 81,269 (Feb. 21, 1991)).

The plan at issue in this case appears to meet that standard. Certainly there does not seem to have been any risk here of Gudmundsson controlling the terms or timing of his receipt of the stock

---

[3](...continued)

(ii) Is not made in connection with the participant's death, disability, retirement or termination of employment;

(iii) Is not required to be made available to a plan participant pursuant to a provision of the Internal Revenue Code; and

(iv) Results in either an intra-plan transfer involving an issuer equity securities fund, or a cash distribution funded by a volitional disposition of an issuer equity security.

17 C.F.R. § 240.16b-3(b)(1).

in a way that would have allowed him to take advantage of inside information, which is the evil that the prohibition of short-swing trading was designed to prevent. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 608-09 (1973); *Roth v. Reyes*, 567 F.3d 1077, 1079 (9th Cir. 2009); *Roth v. Jennings*, 489 F.3d 499, 507 (2d Cir. 2007).

In addition, the six-month period under Rule 16(b) had expired by the time that Gudmundsson received the stock shares in July 1999. Gudmundsson had received the right to future distribution of those shares on July 1, 1998. That right constituted a "derivative security," which is a "financial instrument[] that derive[s its] value (hence the name) from an underlying security or index." *Magma Power Co. v. Dow Chemical Co.*, 136 F.3d 316, 321 (2d Cir. 1998). *See also Morrison v. Madison Dearborn Capital Partners III L.P.*, 463 F.3d 312, 314-15 (3d Cir. 2006) ("A derivative security is 'any option, warrant, convertible security, stock appreciation right, or similar right with an exercise or conversion privilege at a price related to an equity security, or similar securities with a value derived from the value of an equity security'") (quoting 17 C.F.R. § 240.16a-1(c)). The SEC Form 5 submitted on Gudmundsson's behalf by his attorney in 1999 also reported that as of July 1, 1998, Gudmundsson was the beneficial owner of a derivative security in the form of the right to the distribution of 73,105 shares of Aurora stock. Stip. ¶ 20.

The significance of that lies in the fact that "holding derivative securities is functionally equivalent to holding the underlying equity securities for purposes of Section 16 ... ." *Magma Power Co.*, 136 F.3d at 321.[4] Thus, the restrictions imposed by § 16 were triggered by Gudmundsson's

---

[4]Plaintiffs contend that this statement in *Magma* was dicta, and that *Magma* is distinguishable and not controlling here for a number of reasons. *See* Plaintiffs' Reply Brief (Dkt. #15) at 4-5. The Second Circuit reaffirmed that statement in *Gwozdzinsky v. Zell/Chilmark*
(continued...)

receipt of the distribution rights on July 1, 1998. *See also Montgomery v. Commissioner*, 127 T.C. 43, 58 (2006) ("It is well settled that it is the acquisition (grant) of a stock option (as opposed to the exercise of a stock option) that is deemed to be a purchase of a security for purposes of the 6-month short-swing profit recovery provision under section 16(b)").

The six-month period under § 16(b) therefore expired as of January 1, 1999. The fact that Gudmundsson did not receive the actual stock shares until July 1, 1999 is inconsequential, since his receipt of the derivative security, *i.e.*, the right to a future distribution of stock, was "functionally equivalent" to a receipt of the stock itself for purposes of § 16. *Magma Power*, 136 F.3d at 321 (quoting *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, Exchange Act Release No. 28,869, Fed.Sec.L.Rep. (CCH) ¶ 84,709, at 81,258 (Feb. 8, 1991)).[5]

,In fact, Rule 16b-3(d)(3) expressly provides an exemption for any transaction involving an acquisition from the issuer, provided that the securities in question "are held by the officer or director for a period of six months following the date of such acquisition, provided that this condition shall be satisfied with respect to a derivative security if at least *six months elapse from the date of acquisition of the derivative security* to the date of disposition of the derivative security (other than upon exercise or conversion) or its underlying equity security." 17 C.F.R. § 204.16b-3(d)(3) (emphasis added).

---

[4](...continued)
*Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998), and I do accept and follow it.

[5]While *Magma Power* involved stock options (which are not at issue in this case), there is no indication in the Second Circuit's opinion that its discussion of Rule 16(b) was intended to be limited to that particular form of derivative securities, rather than to derivative securities generally.

In addition, Rule 16b-6(b) provides that

> [t]he closing of a derivative security position as a result of its exercise or conversion shall be exempt from the operation of section 16(b) of the Act, and the acquisition of underlying securities at a fixed exercise price due to the exercise or conversion of a call equivalent position or the disposition of underlying securities at a fixed exercise price due to the exercise of a put equivalent position shall be exempt from the operation of section 16(b) of the Act[.]

As explained by the United States Tax Court, these provisions,

> [r]ead together, ... provide that (1) the establishment of a call equivalent position (grant of a stock option) shall be deemed a purchase of the underlying security for purposes of section 16(b) of the Exchange Act, (2) the acquisition of underlying securities at a fixed price upon the exercise of a call equivalent position shall be exempt from the operation of section 16(b) of the Exchange Act, and (3) if 6 months elapse between the acquisition of a derivative security and the disposition of the derivative security or its underlying equity security, the transaction is exempt from the operation of section 16(b) of the Exchange Act.

*Montgomery*, 127 T.C. at 61 (concluding that since petitioner did not sell any shares within six months of March 1999, which was the last date on which his employer granted him an incentive stock option, petitioner qualified for the exemption set forth in Rule 16b-3(d)(3), and that he was not subject to suit under section 16(b) during 2000).[6]

---

[6]The Second Circuit in *Magma Power* explained that

> [a] call option gives the option holder the right to buy shares of an underlying security at a particular price; thus, "[a] 'call equivalent position' is a derivative security position that increases in value as the value of the underlying equity increases." A put option is the right to sell a security at a specified price; thus, the value of a put option increases as the price of the underlying security falls. "[A] 'put equivalent position,' ... means a derivative security position that increases in value as the value of the underlying equity security decreases."

136 F.3d at 321 n.2 (quoting 3C Harold S. Bloomenthal and Samuel Wolff, Securities and Federal Corporate Law § 10.11 at 10.73, 10.74 (1997)).

In the case at bar, Gudmundsson's receipt of Aurora stock on July 1, 1999 amounted to a conversion of the derivative security that he had received a year earlier, *i.e.*, his fixed right to the future distribution of the stock. Similarly, Gudmundsson's receipt of the Aurora shares constituted an acquisition of those underlying securities at a fixed exercise price due to the conversion of a call equivalent position. Gudmundsson's receipt of the stock on July 1, 1999, then, was exempt from the operation of § 16(b).

Plaintiffs argue that the rule equating derivative securities with the stock on which the value of the derivative securities is based applies only for purposes of § 16, not § 83. Plaintiffs' Reply Brief at 4-5. That argument is wide of the mark. The issue here is whether Gudmundsson could have sold the stock at any time after July 1, 1999 without subjecting himself to suit under § 16(b). Because the six-month period of § 16(b) was triggered by his receipt of the derivative securities in 1998, the answer to that question is yes. *See Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) (under § 16(b), "holding derivative securities [is] functionally equivalent to holding the underlying equity securities"); *Levy v. Oz Master Fund, Ltd.*, No. 00 CIV. 7148, 2001 WL 767013, at *3 (S.D.N.Y. July 9, 2001) ("the holder's later exercise or conversion of the derivative security into common stock does not constitute a new 'purchase,'" since it "is 'nothing more than a change from an indirect form of beneficial ownership of the underlying securit[y] to a more direct one'") (quoting *Magma Power*, 136 F.3d at 322)); *see also Tanner*, 2003 WL 21310275, at *2 (stating that "[t]he tax statute and regulations protect a recipient of stock options [from tax liability] for the first six months after their grant, consistent with section 16(b), but do not afford [a] rolling protection ... based on every future event of exercise of the options").

In short, had Gudmundsson sold the underlying equity securities–*i.e.*, the Aurora stock–on the date he received them, July 1, 1999, he would not have been subject to suit under § 16(b), because by then over *twelve* months would have elapsed since the date on which he acquired the derivative securities. *See Strom v. United States*, 583 F.Supp. 1264, 1269 (W.D.Wash. 2008) (because plaintiffs' acquisition date of stock options in November 1998 constituted the purchase date under § 16(b), they were "free to sell the stock in 1999 and 2000," when they exercised their options; the six-month period of § 16(b) was not triggered by the vesting date, since "[n]o insider information comes into play on the vesting date, making that date a non-even under § 16(b)").

Plaintiffs' contention that a substantial risk of forfeiture also existed under § *10*(b) (as opposed to § 16(b)) is based on an argument that has been squarely rejected by the courts. Even if Gudmundsson would have been subject to suit under § 10(b) had he sold the stock in 1999, that would not give rise to a substantial risk of forfeiture under § 83. *See Merlo v. Commissioner*, 492 F.3d 618, 622 (5th Cir. 2007) (stating that "the only type of suit identified as subjecting property to a substantial risk of forfeiture is a suit brought under § 16(b)," and that "[f]or civil suits such as [suits under § 10(b)] to be considered within the definition of a substantial risk of forfeiture, Congress would have to amend § 83"); *United States v. Tuff*, 469 F.3d 1249, 1256 (9th Cir. 2006) ("By enacting I.R.C. § 83(c)(3), Congress demonstrated that civil suits are not generically covered by I.R.C. § 83 ... . [T]his indicates that for a civil violation to be considered a substantial risk of forfeiture, Congress must act specifically to include it within the scope of I.R.C. § 83").

## II. What Is the Correct Method of Valuation of the Stock?

Plaintiffs also argue that the publicly traded price of Aurora stock on July 1, 1999 is not the proper measure of the fair market value of the stock. Plaintiffs contend that because the stock that had been issued to Gudmundsson was not registered with the SEC, and therefore not tradeable on any public exchange, the price of Aurora stock on the New York Stock Exchange is not a fair measure of the stock's value. Plaintiffs argue that "private placement value" should be used instead, and that the valuation should take into account the fraud that occurred here.

Plaintiffs' position is not supported by the case law on this subject. In support of their argument that private-placement value should govern, plaintiffs cite *Gresham v. Commissioner*, 752 F.2d 518 (10th Cir. 1985). In *Gresham*, the Tenth Circuit held that a Treasury regulation implementing the "minimum tax" provision of § 57(a)(6) was inconsistent with the plain language of that statute, and hence invalid, because the regulation incorporated the valuation principles of § 83 of the Internal Revenue Code.

In particular, the court held that there was no sound basis for the regulation's utilization of § 83's provision that the fair market value of stock or stock options should be determined without regard to lapse restrictions, because "section 57(a)(6) *does not contain the language in section 83(a)(1)* directing that fair market value be determined without regard to restrictions which by their terms might lapse ... ." *Id.* at 521 (emphasis added). If anything, then, the court indicated that, in situations to which § 83 does apply, lapse restrictions *should* be ignored in determining value.[7]

---

[7]Plaintiffs' reliance on *McDonald v. Commissioner*, 764 F.2d 322 (5th Cir. 1985), is similarly misplaced. In *McDonald*, the Fifth Circuit likewise held that "by applying section 83 rules to section 57(a)(6), the Commissioner exceeded his statutory authority." *Id.* at 322.

The Supreme Court's decision in *United States v. Cartwright*, 411 U.S. 546 (1973), also does not support plaintiffs' position on this score. *Cartwright* did not involve § 83, but rather the valuation of mutual fund shares for purposes of the federal estate tax, which required that the "value" of all property held by a decedent at the time of death be included in the gross estate. Specifically, the Court was applying an implementing regulation providing that "[t]he value of every item of property includable in a decedent's gross estate ... is its fair market value at the time of the decedent's death," and that "[t]he fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *See id.* at 550-51 (citing 26 C.F.R. § 20.2031-1(b)). *Cartwright*, then, is simply inapposite to the case at bar. *See also Harrison v. United States*, 475 F.Supp. 408, 413 (E.D.Pa. 1979) (noting that "the estate tax regulations ... outline the general understanding of fair market value used throughout the Code *in the absence of a specific statutory rule*") (citing *Cartwright*, 411 U.S. at 551) (emphasis added), *aff'd without opinion*, 620 F.2d 288 (3d Cir. 1980).

I also am not persuaded by plaintiffs' argument that, if July 1, 1999 is the proper valuation date, the valuation of the stock should take into account the fraud that caused the price of the stock to be as high as it was on that date. Case authority does not support that argument. "Even when the corporation engages in a 'deliberate, massive fraud' that conceals the true circumstances of the business, the price at which the stock could be bought and sold on a public exchange on the valuation date remains the fair value of the stock–even if the stock recipient is an employee of the company." *Gourley*, 2009 WL 2700206, at *6 (quoting *Horwith v. Commissioner*, 71 T.C. 932, 938-39 (1979)).

*See also Johnson v. Commissioner*, 673 F.2d 262, 263-66 (9th Cir. 1982) (affirming Commissioner's ruling that mean New York Stock Exchange trading price of stock on date that taxpayers exercised stock options appropriately measured stock's fair market value for purposes of determining minimum tax, even though undisclosed violations of securities laws inflated the exchange price when the options were exercised).

Plaintiffs contend that *Gourley* is distinguishable because the taxpayers in that case were able to, and in fact did, sell the shares of stock in question.[8] The court in *Gourley* also noted that although the market value of stock "is generally the fair valuation for tax assessment purposes, ... [t]here are certain limited exceptions to the fair market value rule, such as when 'the stock was not sold on any exchange ... .'" 2009 WL 2700206, at *5 (quoting *Johnson*, 74 T.C. at 96). *See also Johnson*, 673 F.2d at 265 (noting that the taxpayers in that case "were always free to sell their stock at the exchange price"). In the case at bar, plaintiffs note, Gudmundsson was barred under the Securityholders Agreement from selling his stock on the open market for two years.

Again, though, the case at bar is governed by § 83, which expressly provides that lapse restrictions must be ignored in determining property's fair market value. Plaintiffs may consider that provision inequitable, but "the Constitution [does not] require that legislation on economic matters be compatible with sound economics or even with normal fairness." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 44 (1976) (Powell, J., concurring). *Accord Grant v. United States*, 15 Cl.Ct.

---

[8]The dispute in *Gourley* was over the value of the stock on the date that the taxpayers purchased it. The taxpayers, who had paid income tax on the difference between the exercise price of $12.52 per share and the then-market value of $42.125 per share, premised their tax refund claim–which the court rejected–on the theory that on the day they purchased it, the stock was actually worth only $12.52 per share, because of the as yet-undisclosed fraud.

38, 42-43 (1988) (holding that where taxpayer exercised stock option rights to acquire unregistered shares of a publicly traded corporation, and immediately resold half of those shares in a private placement for an amount higher than their purchase price but for less than the market price of the publicly traded shares, stock was to be valued on the basis of its public trading price on the date the option was exercised, rather than on the basis of its private sale value). *See also Alves v. Commissioner*, 734 F.2d 478, 482 (9th Cir. 1984) ("As the Second Circuit has noted, Congress drafted section 83(a) as a 'blanket rule' in an effort to create 'a workable, practical system of taxing employees' restricted stock options'") (quoting *Sakol*, 574 F.2d at 699-700).

## CONCLUSION

Defendant's motion for summary judgment (Dkt. #13) is granted, plaintiffs' motion for summary judgment (Dkt. #12) is denied, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 26, 2009.